

COPY

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | JUDGE KAPLAN |
| **Plaintiff,** | CIVIL ACTION NO. |
| **v.** | 06 CV 3225 |
| LUMENIS, LTD., SAGI A. GENGER, and KEVIN MORANO, | |
| **Defendants.** | **JURY TRIAL DEMANDED** |



RECEIVED
APR 2 6 2006
U.S.D.C. S.D. N.Y.
CASHIERS

## COMPLAINT

Plaintiff Securities and Exchange Commission (the "Commission") alleges that

## SUMMARY

1.     From at least late 2001 through early 2003 (the "Relevant Period"), Lumenis Ltd. ("Lumenis"), an Israeli corporation with executive offices in New York and whose stock is publicly traded in the United States, acting through senior officers, engaged in a fraudulent scheme to inflate revenues and misrepresent other important financial metrics so as to deceive investors as to the company's true financial condition.  The scheme was orchestrated by Lumenis' former chief operating officer, Sagi Genger ("Genger"), and its former chief financial officer, Kevin Morano ("Morano").  The scheme involved the improper recognition of a series of sales transactions that resulted in Lumenis' publication of materially false and misleading financial statements in six consecutive financial reporting periods, starting with those for the year ending December 31, 2001.  Certain of the transactions enabled Lumenis to meet previously announced quarterly revenue targets in two quarters and others helped to lessen the shortfall in

certain quarters when Lumenis missed its predicted revenue figures.  The improper sales

transactions also materially lessened the severity of losses reported by the company during the

Relevant Period, both on a quarterly and yearly basis.

2.      Genger and Morano worked in concert to further the fraudulent scheme at

Lumenis.  Genger induced distributors and other customers to make excessive end-of the quarter

product purchases while knowingly and/or recklessly disregarding the fact that transactions did

not qualify for recognition as proper sales.  Morano allowed Lumenis to record revenue and

profits from the improper transactions while knowingly and/or recklessly disregarding the

various conditions that should have precluded recognition of the sales.  For all of the transactions

at issue, Lumenis recognized revenue in a manner that departed from generally accepted

accounting principles ("GAAP").

3.      By engaging in the transactions and practices alleged in this Complaint:

a.      Lumenis violated Section 17(a) of the Securities Act of 1933 ("Securities

Act") [15 U.S.C. § 77q(a)]; and Sections 10(b), 13(a), 13(b)(2)(A) and 13(b)(2)(B) of the

Securities Exchange Act of 1934 ("Exchange Act") and Rules 10b-5, 12b-20, 13a-1, 13a-11, and

13a-13 thereunder [15 U.S.C. §§ 78j(b), 78m(a), 78m(b)(2)(A), 78m(b)(2)(B) and 17 C.F.R. §§

240.10b-5, 240.12b-20, 240.13a-1, 240.13a-11 and 240.13a-13];

b.      Genger violated Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)];

Sections 10(b) and 13(b)(5) of the Exchange Act and Rules 10b-5, 13b2-1 and 13b2-2 thereunder

[15 U.S.C. §§ 78j(b) and 78m(b)(5) and 17 C.F.R. §§ 240.10b-5, 240.13b2-1 and 240.13b2-2];

and aided and abetted violations of Sections 10(b), 13(a), 13(b)(2)(A) and 13(b)(2)(B) of the

Exchange Act and Rules 10b-5,12b-20, 13a-1, 13a-11, and 13a-13 thereunder [15 U.S.C. §§

78j(b), 78m(a), 78m(b)(2)(A), 78m(b)(2)(B) and 17 C.F.R. §§ 240.10b-5, 240.12b-20, 240.13a-1, 240.13a-11 and 240.13a-13]; and

        c.     Morano violated Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)]; Sections 10(b) and 13(b)(5) of the Exchange Act and Rules 10b-5, 13a-14, 13b2-1 and 13b2-2 thereunder [15 U.S.C. §§ 78j(b) and 78m(b)(5) and 17 C.F.R. §§ 240.10b-5, 240.13a-14, 240.13b2-1 and 240.13b2-2]; and aided and abetted violations of Sections 10(b), 13(a), 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act and Rules 10b-5,12b-20, 13a-1, 13a-11, and 13a-13 thereunder [15 U.S.C. §§ 78j(b), 78m(a), 78m(b)(2)(A), 78m(b)(2)(B) and 17 C.F.R. §§ 240.10b-5, 240.12b-20, 240.13a-1, 240.13a-11 and 240.13a-13];

    4.     Accordingly, the Commission seeks entry of a permanent injunction against each Defendant prohibiting further violations of the federal securities laws.  With respect to Defendants Genger and Morano, the Commission also seeks civil monetary penalties and a permanent bar prohibiting each from serving as an officer or director of a public company.

## JURISDICTION

    5.     This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Sections 21 and 27 of the Exchange Act [15 U.S.C. §§ 78u and 78aa].

    6.     The Commission brings this action pursuant to the authority conferred upon it by Sections 20(b) and (e) of the Securities Act [15 U.S.C. § 77t(b) and (e)] and Sections 21(d) and (e) of the Exchange Act [15 U.S.C. §§ 78u(d) and (e)].

    7.     In connection with the conduct alleged herein, Defendants, directly and indirectly,

made use of the means or instrumentalities of interstate commerce, of the mails, the facilities of national securities exchanges, and/or of the means and instruments of transportation or communication in interstate commerce.

## DEFENDANTS

8.     Lumenis, an Israeli corporation with its headquarters in Yokneam, Israel and executive offices in New York, New York, designs and manufactures laser and light based systems for aesthetic, surgical and other applications.  Lumenis distributes its products in the United States and elsewhere.  During the Relevant Period, Lumenis' main corporate offices, including those of Genger and Morano, were located in New York, New York.  Much of the illegal conduct described herein, including the issuance of false and misleading public statements by the Defendants, occurred in Lumenis' New York office.  Lumenis' stock is registered with the Commission pursuant to Section 12(g) of the Exchange Act and was traded on Nasdaq National Markets System until December 2003, when Nasdaq delisted Lumenis for its failure to comply with Commission regulations requiring audited financial statements.  Lumenis stock currently is quoted on the Pink Sheets.

9.     Sagi A. Genger, age 34, of New York, New York, is the former chief operating officer ("COO") of Lumenis.  He became Lumenis' chief financial officer ("CFO") in November 1999, a position he maintained through July 2001,  when he became its COO.  Lumenis eliminated the position of COO in July 2003, and Genger left the company's employ at that time.  Genger is a citizen of both Israel and the United States.

10.     Kevin Morano, age 52, of Pennington, New Jersey, is the former CFO and

executive vice president of Lumenis and is currently senior vice president for marketing and business development of the company. Morano became the CFO in late February 2002 and remained in that position until approximately May 2004. Morano is a certified public accountant whose license, issued by the state of New Jersey, has been inactive since 1992.

### THE SCHEME

### I.    The Eclipse Transactions

11.    As part of the scheme to defraud investors, Lumenis engaged in at least three transactions with Eclipse Medical, Ltd. ("Eclipse") in late 2001 and 2002 that resulted in the publication of materially false and misleading financial information. All three transactions directly involved Genger, and two involved Morano.

12.    During the Relevant Period, Lumenis sold its products in the United States directly to end users or to distributors. Eclipse was Lumenis' largest distributor in the United States during the Relevant Period. Eclipse and Lumenis began doing business in at least 1996. Sales of Lumenis products during the Relevant Period made up the overwhelming majority of Eclipse's sales.

#### A.    The First Eclipse Transaction: $1 Million
#### Fraudulent Sale In Late 2001 and Early 2002

13.    Throughout 1998, 1999 and 2000, Eclipse amassed a large debt to Lumenis. By the beginning of 2001, Eclipse owed Lumenis more than $4.5 million, and in excess of $3.5 million of those payables were overdue. In February 2001, Lumenis began requiring Eclipse to pay for its orders via credit card as a way to ensure that it paid down its overdue debt. In connection with the new distribution agreement, which the parties entered into "as of"

December 31, 2001, Lumenis forgave the entire outstanding payable balance that Eclipse owed it as of that time — a total of over $3.6 million.

14.     The new distribution agreement also provided Lumenis with the right to acquire Eclipse's distribution operations after several years. As part of the entrance into the new distribution agreement, Lumenis required Eclipse to place an order for approximately $1 million of Lumenis products. At the same time, Lumenis also agreed to "loan" Eclipse $1.25 million, $1 million of which would enable Eclipse to purchase the $1 million in products. The transaction also contemplated that the loan could be addressed as part of Lumenis' future acquisition of Eclipse's distribution business. In essence, Lumenis financed Eclipse's purchase of the products with no payment of principal due for several years, and provided an option whereby the outstanding loan would be credited as part of the purchase price for Eclipse's distribution business.

15.     Genger was a principal negotiator for Lumenis during the negotiations between Lumenis and Eclipse that gave rise to the new distribution agreement and the associated deal described above. Genger was aware that the loan from Lumenis to Eclipse would be used by Eclipse to purchase Lumenis products. Upon learning about the possible linkage between the loan and the product purchase, Lumenis' outside auditor told Lumenis, including Genger, that there could be revenue recognition issues posed by the structure (i.e., that recognition of the $1 million in products may be improper). Subsequent to being informed of the outside auditor's concerns, Lumenis altered the draft of the new distribution agreement documents to remove any language linking the loan to the product purchase. Additionally, Lumenis and Genger also stated

falsely thereafter that the entire $1.25 million loan was for Eclipse to pay tax liabilities, when they knew that $1 million of it was to tied to the product purchase.

16.     Under GAAP, the loan, product purchase, and new distribution agreement should have been evaluated together as one transaction.  GAAP also requires that revenue should not be recognized until it is realized or realizable and earned.  According to SEC Staff Accounting Bulletin 101 ("SAB 101"), this standard is generally satisfied when, among other things, collectability of the funds is reasonably assured.  Here, collectability was not reasonably assured because: (1) Eclipse's $1 million order of Lumenis products was in effect paid for by Lumenis; and (2), Eclipse lacked an ability or willingness to pay for the Lumenis goods absent Lumenis' funding.  Moreover, the transaction lacked economic substance in that the parties contemplated that the $1 million loan would possibly never be paid back but rather would be addressed as part of Lumenis' far-off purchase of Eclipse's distribution business by Lumenis.  The revenue and profits associated with the transaction should have been deferred, at least until the loan was paid off, and then evaluated as part of Lumenis' future purchase of Eclipse's distribution business.  Lumenis, however, treated the product purchase as a separate transaction and recognized the sales in the quarters in which the products were shipped – approximately $824,000 in the fourth quarter of fiscal year 2001 ending December 31, 2001 and approximately $204,000 in its first fiscal quarter of fiscal year 2002 ending March 31, 2002.  Genger, based on his experience at Lumenis, as well as his interactions with the outside auditors, knew or recklessly disregarded the fact that it was improper to recognize the sales as was done and that it would be misleading to investors to report it as such.

7

17.    The recognition of the revenue and profits associated with these sales resulted in Lumenis filing a false and misleading Form 10-K for the year ended December 31, 2001 on April 17, 2002, and a false and misleading Form 10-Q for the quarter ended March 31, 2002 (the first quarter of 2002) on May 15, 2002.

18.    The improper recognition of the $1 million sales transaction described above resulted in the public dissemination of false and misleading financial information in Commission filings and other communications, including a press release and earnings call on February 28, 2002 for the fourth quarter 2001 results and a press release on May 13, 2002, and an earnings call on May 14, 2002, for the first quarter 2002 results, including:

a.    Overstatement of revenues of approximately $824,000 in the fourth quarter of fiscal year 2001 ending December 31, 2001, where reported quarterly revenues were $100.8 million.

b.    Overstatement of revenues of approximately $204,000 in the first fiscal quarter of fiscal year 2002 ending March 31, 2002, where reported quarterly revenues were $86.1 million.

c.    Understatement of loss of approximately $616,000 in the fourth quarter of fiscal year 2001 ending December 31, 2001, where the fourth quarter's reported net loss was $3.9 million, and reported net loss per diluted share was $.11 for 36,613,000 diluted shares.

d.    Understatement of loss of approximately $149,000 in the first quarter of fiscal year 2002 ending March 31, 2002, where the first quarter's reported net loss was $643,000, reported net loss per diluted share was $.02 for 36,713,000 diluted shares, and reported earnings before interest, taxes, depreciation, and amortization ("EBITDA") was a positive $7.5 million.

8

**B.    Second Eclipse Transaction: $4 Million**
<u>**Eclipse Order in the Second Quarter of 2002**</u>

19.    A $4 million Eclipse transaction at the close of the quarter ended June 30, 2002

(the second quarter of 2002) also resulted in Lumenis recognizing revenue and profits in its Form

10-Q filed with the Commission on August 15, 2002 in a manner that did not comport with

GAAP.  The improper recognition related to an oral promise from Genger to Eclipse that

permitted Eclipse to substitute inventory.  Additionally, Genger provided payment terms that

extended considerably beyond the terms of the parties' recently executed distribution agreement,

and well beyond those normally accepted by Lumenis.  Finally, issues relative to Eclipse's

creditworthiness existed because of questions surrounding the viability of Eclipse absent

Lumenis business and the impact of Lumenis' 2001 forgiveness of Eclipse receivables.  Morano

knew about the extended payment terms.  He also knew about and recklessly disregarded the

issues related to Eclipse's creditworthiness.

20.    The new distribution agreement between Eclipse and Lumenis, entered into as of

December 31, 2001, initially granted Eclipse "net 30 day" payment terms, meaning that Eclipse

was required to pay Lumenis for purchases within 30 days of shipment.  Shortly thereafter,

Lumenis agreed to amend those payment terms to net 60 days.  The amendment was made in part

to permit Eclipse a greater opportunity to sell the products to end users before requiring Eclipse

to pay Lumenis.

21.    As the second quarter of 2002 was coming to a close, Genger contacted Eclipse

and requested that it place a $4 million order.  Instead of requiring Eclipse to pay for the products

pursuant to the standard net 30 or net 60 day terms, Genger and Lumenis granted Eclipse

extended payment terms, specifically $1.5 million due in 90 days, $500,000 due in 180 days, and

$2 million due in 270 days.  It was the largest order Eclipse had ever placed with Lumenis.  The

extended payment terms were provided in part to allow Eclipse a greater opportunity to sell the

products to end users before requiring Eclipse to pay Lumenis because Eclipse lacked an ability

to pay for $4 million in products on standard terms absent sell-through to end customers.

22.     Eclipse initially placed an order for $4 million of specific Lumenis products, but

Lumenis lacked sufficient inventory to fill the entire order.  Rather than wait until Lumenis

possessed all of the products that Eclipse had ordered, which would have occurred after the close

of the financial reporting period, Eclipse and Lumenis agreed that Eclipse would accept some

products different than those initially requested, but that Lumenis currently had in inventory, to

ensure that the total order remained $4 million.

23.     As part of the deal, Genger orally promised Eclipse a right to substitute all the

products it was then purchasing for different products in the future.  Eclipse, in fact, with Genger

and Morano's approval, later exchanged a portion of the inventory it  received in connection with

the $4 million order for different products.

24.     On August 5, 2002, Lumenis issued a press release announcing its second quarter

2002 financial results.  Morano worked on and reviewed the release prior to its issuance.  The

release announced revenue of $92.2 million, including $4 million from the Eclipse transaction,

and stated that Lumenis' revenue was in line with previous revenue guidance of $90-95 million:

> Our performance this quarter enabled us to deliver on several promises we made to
> investors.  Most importantly, we were cash flow positive and met our revenue and gross
> margin targets.

Inclusion of the improperly recognized $4 million Eclipse transaction in Lumenis' quarterly revenue allowed the company to meet the revenue target it had previously promised to investors. Lumenis' stock price, which previously had been declining steadily, in part because the company missed its revenue targets in the prior two quarters, more than doubled in the days following the release, jumping from $3.19 per share on August 5 to $6.55 per share on August 26, 2002.

25.     On August 13, 2002, prior to Lumenis' filing of its quarterly financials with the Commission, Lumenis' outside auditor emailed Morano and informed him that after discussions with auditors in his U.S. affiliate, he had accounting concerns related to the recognition of the $4 million sale to Eclipse in the second quarter. The auditor requested significant additional information to resolve the concerns and also requested from Morano an opportunity to discuss the matter with the Lumenis audit committee.

26.     The outside auditor's concerns focused on two issues. The first issue was whether Lumenis needed an independent third-party valuation to determine whether the distribution business buyout provision contained in the new distribution agreement with Eclipse constituted a revenue incentive, such that revenue would need to be reduced for transactions involving Eclipse. The second issue was whether recognition of revenue on sales to Eclipse should be deferred until Eclipse sold the products to end users, taking into consideration the impact that Lumenis' prior forgiveness of the $3.6 million in Eclipse receivables had on Lumenis' ability to immediately recognize revenue on sales to Eclipse and the viability of Eclipse absent Lumenis' business.

27.     By August 15, 2002 – the day Lumenis' quarterly financial filing was due at the Commission – neither Morano nor Lumenis had provided the outside auditor with the additional information he requested. Morano knowingly or recklessly disregarded the legitimate concerns

11

raised by Lumenis' outside auditors, and failed to undertake a substantial inquiry into most if not all of the issues raised.  Despite this, on August 15, 2002, Lumenis filed its Form 10-Q, signed by Morano, containing false financial statements calculated based on the entire $4 million Eclipse order being recognized as a proper sale in the second quarter.  Morano certified the accuracy of the Form 10-Q in a Form 8-K filed with the Commission on the same day.

28.     Under GAAP, recognition of revenue on product sales, where a right of return or exchange exists, is proper only when, among other things, the amount of future returns can be reasonably estimated and, to the extent measurable, a reserve is recorded in that amount. Absence of historical experience with similar types of sales of similar products may impair the ability to make a reasonable estimate.  In addition, in situations where a right of return or exchange exists, revenue can only be recognized when, among other things, the buyer's obligation to pay is not contingent on resale of the product.  All of these elements were missing in this transaction.  In addition, collectability of the funds was not reasonably assured at the time the revenue was recognized, and unresolved accounting questions surrounding Eclipse's viability and its past relationship with Lumenis should have impacted revenue recognition.  As a result, recognition of the $4 million in connection with this transaction was not in conformity with GAAP.

29.     Genger and Morano knew or were reckless in not knowing this transaction should not have been recognized as a sale in the second quarter of 2002 and that reporting it as such would be misleading to investors.

30.     The improper recognition of the $4 million sales transaction in the second quarter of 2002 resulted in the public dissemination in Commission filings and other communications,

including a press release on August 5, 2002 and an earnings call on August 6, 2002, of false and

misleading financial information by defendants, including:

        a.      Overstatement of second quarter revenues of approximately $4 million,

where reported quarterly revenues were $92.2 million.

        b.      Understatement of loss in the second quarter of approximately $2.9

million, where the second quarter's reported net loss was $1.3 million, reported net loss per

diluted share was $.04 for 36,798,000 diluted shares, and reported EBITDA was a positive $8.4

million.

### C.     The Third Eclipse Transaction:
###            $750,000 Order in the Third Quarter of 2002

     31.     An Eclipse transaction, brokered by Genger and approved by Morano, at the close

of the quarter ended September 30, 2002 (the third quarter of 2002) also resulted in Lumenis

recording revenue and associated profits on its books and recognizing revenue in its Form 10-Q

filed with the Commission on November 19, 2002 in a manner that did not comport with GAAP.

     32.     Near the end of the third quarter of 2002, Genger approached Eclipse and asked

that it place an order with Lumenis.  Eclipse initially did not want to place an order because it

had just purchased $4 million of products in the prior quarter.  As a way to entice Eclipse into

doing so, Genger told Eclipse that Lumenis had sales orders for "Lightsheer" lasers that Lumenis

could not fill due to an inventory shortage.  Eclipse possessed Lightsheer lasers in its inventory.

Genger offered to permit Eclipse to fill Lightsheer sales orders with Eclipse inventory on the

condition that Eclipse order "Quantum" lasers in a dollar amount equal to the Lightsheer sales

orders Lumenis would provide. As part of the deal, Genger agreed that Eclipse would not have to pay Lumenis for the Quantums until it collected on the Lightsheer sales orders.

33.     Prior to finalizing the transaction, Genger sought Morano's approval of the deal. In a telephone call in late September 2002 involving, among others, Morano and Genger, Genger proposed passing Lightsheer sales orders to Eclipse in exchange for Eclipse ordering Quantums of an identical dollar amount to the Lightsheer sales orders to be provided. As part of the proposed transaction, Genger and Morano understood that Eclipse would not be required to pay Lumenis for the Quantums until such time as Eclipse had collected funds from the Lightsheer sales order customers. Morano and Genger agreed to discuss the proposed transaction in further detail to determine whether to approve it. Thereafter, the deal was approved.

34.     The transaction as finalized required Lumenis to provide Eclipse with Lightsheer sales orders totaling $750,211.20 and Eclipse to order Quantums totaling $750,211.20. Lumenis agreed to permit Eclipse to collect on the Lightsheer sales orders before requiring it to pay for the Quantums. Genger and Morano were aware Lumenis had agreed to permit Eclipse to collect on the Lightsheer sales orders before requiring it to pay for the Quantums.

35.     Eclipse would not have placed an order with Lumenis in the third quarter of 2002 absent Lumenis agreeing to provide it with Lightsheer sales orders. Genger was aware Eclipse would not have placed an order with Lumenis in the third quarter of 2002 absent Lumenis agreeing to provide Eclipse with Lightsheer sales orders.

36.     Lumenis did not deliver the Lightsheer orders before the end of the third quarter. In early and mid-October, Eclipse, in an effort to collect the money on the Lightsheer sales orders that would allow it to pay Lumenis, requested that Lumenis provide it with the Lightsheer sales

14

orders it had been promised.  Lumenis was unable to do so.  Morano was aware both of the

Eclipse requests for the sales orders and Lumenis' difficulty in providing the sales orders.

37.     In mid-October 2002, even though it had just bought $750,000 worth of Quantum

lasers, Eclipse requested to exchange approximately $835,000 in Quantums it had purchased

previously for different lasers.  Morano was aware of this Eclipse request.

38.     On October 28, 2002, Eclipse's CFO emailed Genger (through Genger's assistant)

and another Lumenis employee citing "the deal" made with Genger at the close of September that

linked the provision of the Lightsheer sales orders with Eclipse's payment on the Quantums.  A

Lumenis finance staff employee responded to the October 28 Eclipse CFO email on November 4,

2002, copying Genger (through his assistant).  The email does not dispute Eclipse's description

of the deal and apologizes for "the extreme delays in meeting our commitment to you."

39.     In early November, the same Lumenis finance staff employee sought approval

from Morano and Genger to buy back the Lightsheers in Eclipse's inventory as a means to,

among other things, address Lumenis' failure to provide Eclipse with Lightsheer sales orders.

Such a buyback would have provided Eclipse with the same cash flow it would have received

had Lumenis provided it with the Lightsheer sales orders, thereby allowing Eclipse to pay for the

Quantums.  Morano and Genger approved the buyback offer, though it ultimately never came to

fruition.

40.     On November 19, 2002, despite the clear link between the provision of the

Lightsheer sales orders and the payment for the Quantums, Lumenis, with Morano's knowledge,

improperly recognized revenue of over $750,000 and associated profits in connection with this

transaction in its Form 10-Q filed with the Commission for the third quarter of 2002.  Morano

15

signed the Form 10-Q on behalf of Lumenis and also certified the accuracy of the Form 10-Q in a

Form 8-K filed with the Commission on the same day.

41.     Thereafter, Lumenis remained unable to provide Eclipse with any Lightsheer sales

orders.  Since Eclipse was unable to collect funds from the Lightsheer end users, it demanded it

be permitted to return the Quantums it had just received.  Genger and Morano agreed.  Rather

than reverse the over $750,000 out of its financial statements in the third quarter of 2002,

Lumenis reversed its recognition of revenue from the Eclipse Quantum transaction in the fourth

quarter of 2002.

42.     Even though this was an unusual transaction with an important partner, at no time

prior to recognizing the revenue in connection with this transaction did Morano inform Lumenis'

outside auditor that payment by Eclipse on the $750,000 in Quantums was in any way linked to

its being provided and collecting on an equal amount of Lightsheer sales orders.

43.     Under GAAP, revenue should not be recognized until it is realized or realizable

and earned.  This standard is satisfied in part when, among other things, collectability of the

funds is reasonably assured.  Here, Lumenis recognized revenue on the purported sale to Eclipse

that was contingent on Lumenis' obligation to provide Lightsheer orders, and collectability was

contingent Eclipse colleting an equal amount from third parties.  As such, Lumenis departed

from GAAP in recognizing this $750,000 revenue.

44.     Genger and Morano knew or were reckless in not knowing this transaction should

not have been recognized as a sale in the third quarter of 2002 and reporting it as such would be

misleading to investors.

45.    The improper recognition of the $750,000 sales transaction in the third quarter of 2002 resulted in the public dissemination in Commission filings and other communications, including a press release on October 29, 2002 and an earnings call on October 30, 2002, of false and misleading financial information by defendants, including:

a.    Overstatement of third quarter revenues of approximately $750,000, where reported quarterly revenues were $90.2 million.

b.    Understatement of loss of approximately $541,000 in the third quarter, where the quarter's reported net loss was $928,000, reported net loss per diluted share was $.02 for 37,264,000 diluted shares, and reported EBITDA was a positive $8 million.

## II.    **Improperly Accounted For Transactions With Other Parties**

46.    Throughout 2002 and early 2003, Lumenis departed from GAAP in accounting for a number of large transactions with clients other than Eclipse that resulted in the improper recognition of nearly $3 million in revenue and associated profits. Genger and/or Morano were directly involved in all six transactions.

### A.    **Shipment of Products Not Ordered by Dr. N in the First Quarter of 2002**

47.    Lumenis improperly recorded in its books and recognized $116,000 in revenue and associated profits related to a sale to a doctor in Florida ("Dr. N") in the quarter ended March 31, 2002 (the first quarter of 2002). Genger granted Dr. N a right of product substitution when Lumenis was unable to ship what he ordered, and instead shipped unwanted products totaling approximately the same dollar value as the desired products.

48.    Towards the end of the first quarter in 2002, Dr. N wanted to buy three LightSheer XC laser systems. The products were not available for shipment and instead Genger made a deal

17

with the doctor whereby Lumenis sent three LightSheer ET laser systems and Genger promised

Dr. N that he could return the LightSheer ET systems for LightSheer XC systems when the

products became available.

49.    Dr. N refused to pay until the LightSheer XC systems he ordered were provided.

Genger was informed that Dr. N would not pay until he received the lasers he ordered, and

Genger approved the shipment of replacement lasers to the buyer.

50.    Lumenis improperly reported the $116,000 in revenue and associated profits in

the first quarter of 2002 in its Form 10-Q filed with the Commission on May 15, 2002.

51.    To properly recognize revenue, GAAP requires that all rights of return/exchange

have been exercised or expired.  Lumenis recognized the sale to Dr. N upon shipment while it

still had an outstanding obligation to exchange the products.  As a result, its recognition of

$116,000 in connection with this transaction upon shipment of the unordered products (i.e., the

Lightsheer ET laser systems) was not in conformity with GAAP.  Genger knew or recklessly

disregarded the fact that it was improper to recognize this sale transaction given the pending

obligation to Dr. N and reporting it as such would be misleading to investors.

52.    The improper recognition of the $116,000 sales transaction involving Dr. N

resulted in the public dissemination in Commission filings and other communications, including

a press release and earnings call on February 28, 2002, of false and misleading financial

information, including:

a.    Overstatement of revenues of approximately $116,000 for the first fiscal

quarter of 2002, where reported quarterly revenues were $86.1 million.

18

b.      Understatement of loss of approximately $68,000 for the first quarter of fiscal year 2002 ending March 31, 2002, where the first quarter's reported net loss was $643,000, reported net loss per diluted share was $.02 for 36,713,000 diluted shares, and reported EBITDA was a positive $7.5 million.

**B.      The $600,000 Transaction with Pure Laser
in the Third and Fourth Quarters of 2002**

53.      Lumenis improperly recorded in its books and recognized over $600,000 in revenue and associated profits related to a sale to Pure Laser ("Pure") in the quarters ended September 30, 2002 and December 31, 2002 (the third and fourth quarters of 2002).  It was improper for Lumenis to recognize the sales to Pure upon shipment where there was no definitive agreement on payment terms and collectability of the debt from Pure was not reasonably assured. Morano both approved the transaction and decided to record it as revenue over the objections of Lumenis' finance staff.

54.      In September 2002, Pure was a start-up company with limited financial resources and a new Lumenis client.  As of September 30, 2002 (the last day of the third quarter of 2002), Morano knew that Lumenis and Pure had not agreed in writing on payment terms.  Morano also knew that Lumenis' revenue recognition policy required that the terms of any transaction be finalized in a signed writing that was received by the company prior to the end of the quarter in which the sale was to be counted.

55.      Prior to the close of the second quarter, Lumenis' Senior Financial Officer for the Americas ("SFO")  told Morano and Genger that neither she nor the Americas treasurer believed the Pure transaction should be approved because it did not meet Lumenis' creditworthiness

standards.  The SFO also communicated that she and the treasurer recommended not to ship

products to Pure and that Lumenis not recognize revenue in connection with the transaction.

Over those objections, Morano approved the transaction and indicated that Lumenis should ship

and record the sale in the second quarter.  Thereafter, Lumenis included revenue and associated

profits in connection with the transaction on Lumenis' internal books and records.

56.     On October 9, 2002, after the close of the third quarter 2002 financial reporting

period, Pure signed and returned a sales quote to Lumenis that stated "[n]o payment for 6 months

internal financing to be acceptable by buyer," leaving open the date by which the sales price

would be paid off.  Lumenis' revenue recognition policy typically required payment terms of net

thirty or net sixty days for recognition upon product shipment.  The Americas treasurer informed

Morano of the terms of the sales quote.  Soon thereafter, Morano approved payment terms of no

payment for 6 months to be followed by 24 months internal Lumenis financing (i.e., payment

over 30 months).  Such extended payment terms were highly unusual.  At the time, Morano was

aware that the payment terms had not been agreed to in writing.

57.     Shortly thereafter, the SFO and treasurer included the Pure transaction on a so-

called "credit accrual" list of transactions they believed should not be recorded as revenue in the

given quarter.  In a subsequent phone call, the SFO informed Morano that both she and the

treasurer did not feel comfortable with the transaction and believed that Lumenis should not

recognize revenue in connection with it.  Soon thereafter Morano informed her that the Pure

transaction should be taken off the credit accrual list and that revenue in connection with the

transaction should not be reversed.

58.     The Form 10-Q Lumenis filed with the Commission on November 19, 2002

contained approximately $232,000 in revenue in connection with the Pure transaction. Morano signed the Form 10-Q on behalf of Lumenis and separately certified its accuracy in a Form 8-K filed with the Commission on the same day.

59.    In mid-December 2002, Morano learned that Lumenis still lacked a written agreement on payment terms concerning the Pure transaction. When Lumenis tried to get a signed agreement, Pure claimed that it had agreed to payments over 36 months, not 24 months.

60.    Despite Morano's awareness of the lack of agreement on payment terms, Lumenis recognized an additional $373,000 in connection with this transaction in the fourth quarter of 2002 in its Form 10-K filed with the Commission on March 28, 2003. Morano signed the Form 10-K on behalf of Lumenis and separately certified its accuracy within the filing.

61.    Pure did not sign an agreement on payment terms until April 23, 2003, more than six months after Lumenis originally recorded the transaction. The terms of the agreement called for payments to be made over 48 months. Lumenis did not reverse the revenue recognized in connection with this transaction until the fourth quarter of 2003.

62.    Under GAAP, revenue should not be recognized until it is realized or realizable and earned. This standard is generally satisfied when, among other things, there is persuasive evidence of an agreement and collectability of the funds are reasonably assured. In the Pure transaction, both of these elements were lacking at the time of the revenue recognition, and as such Lumenis' recognition of over $600,000 in connection with this transaction departed from GAAP. Morano knew or recklessly disregarded the fact that recognition of the sale in the third and fourth quarters was not in conformity with GAAP and reporting it as such would be misleading to investors.

63.    The improper recognition of the approximately $600,000 sales transaction with Pure in the third and fourth quarters of 2002 resulted in the public dissemination of false and misleading financial information by defendants in Commission filings and other communications, including a press release on October 29, 2002 and an earnings call on October 30, 2002 for the third quarter results, and a press release on February 19, 2003 and an earnings call on February 20, 2003 for the fourth quarter results, including:

a.    Overstatement of revenues of approximately $231,000 for the third quarter of 2002, where reported quarterly revenues were $90.2 million.

b.    Understatement of loss of approximately $174,000 for the third quarter of 2002, where the quarter's reported net loss was $928,000, reported net loss per diluted share was $.02 for 37,264,000 diluted shares, and reported EBITDA was a positive $8 million.

c.    Overstatement of revenues of approximately $373,000 for the fourth quarter of 2002, where reported quarterly revenues were $79.4 million.

d.    Understatement of loss of approximately $260,000 for the fourth quarter, where the quarter's reported net loss was $39.716 million, reported net loss per diluted share was $1.07 for 37,277,000 diluted shares, and reported EBITDA was a negative $9.5 million.

**C.    The $434,000 Transaction with Loving Laser in the Third Quarter of 2002**

64.    In the quarter ended September 30, 2002 (the third quarter of 2002), Lumenis improperly recorded on its books and recognized revenue of almost $434,000 in its Form 10-Q filed with the Commission on November 19, 2002 in connection with the sale of six lasers to Loving Laser Centers ("Loving"), four of which lasers Lumenis provided with Morano's approval on a "bill and hold" basis. Genger was involved in the negotiation of the transaction,

22

and Morano approved both the transaction itself and the decision to record it as revenue despite the objections of members of Lumenis' finance staff.

65.     Generally, a "bill and hold" transaction is a practice whereby a customer agrees to purchase goods but the seller retains physical possession until the customer requests shipment to designated locations. SEC Accounting and Auditing Enforcement Release No. 108 (August 5, 1986) ("AEER 108") sets forth seven criteria that, in connection with the normal requirements, should be met for revenue recognition in bill and hold transactions: (1) the risk of ownership must have passed to the buyer; (2) the customer must have made a fixed commitment to purchase the goods; (3) the buyer must request the transaction be on a bill and hold basis; (4) the buyer must have a substantial business purpose for ordering the goods on a bill and hold basis; (5) there must be a fixed delivery schedule for the delivery of the goods; (6) ordered goods must be segregated from the seller's inventory; and (7) equipment must be complete and ready for shipment. At the time of the revenue recognition in connection with the Loving transaction, Lumenis lacked a definitive agreement on payment terms, collectability was not reasonably assured, and certain bill and hold criteria were not met.

66.     In late September 2002, the Americas treasurer complained in an email to Morano and others that the "agreed upon [Loving] payment terms are not in writing and are unclear" and noted that Loving had a poor credit history. The treasurer sent another email to Morano stating Genger had "approved shipment with no financing." Morano instructed a Lumenis sales director to sell two lasers to Loving immediately through a leasing company and four to Loving on a bill and hold basis, with payments to begin in December 2002. On September 30, 2002 (the last day of the third quarter of 2002), the Americas treasurer informed Morano that the lease purchase

orders were not issued due to "very poor credit" and specifically asked if "payment terms have been documented." They had not been, and Morano did not follow-up to determine if they had been. Thereafter, Lumenis agreed to provide Loving with internal financing.

67.    Prior to the close of the third quarter, the SFO for the Americas told Morano and Genger that neither she nor the Americas treasurer believed that the Loving transaction should be approved from a credit standpoint. The SFO also communicated that she and the treasurer recommended that Lumenis not ship products and not recognize revenue in connection with the transaction. Over those objections, Morano approved the transaction and indicated that Lumenis should ship and post the transaction. Thereafter, Lumenis included revenue in connection with the transaction on its internal books and records.

68.    Shortly after the close of the third quarter but before Lumenis filed its financial statements with the Commission, the SFO and treasurer included the Loving transaction on a so-called "credit accrual" list of transactions they believed should not be recorded as revenue. In a subsequent phone call, the SFO informed Morano that both she and the treasurer did not feel comfortable with the transaction and believed that Lumenis should not recognize revenue in connection with it. Soon thereafter Morano informed her that the Loving transaction should be taken off the credit accrual list and that revenue in connection with the transaction should not be reversed.

69.    Lumenis recognized $434,000 in revenue in connection with the Loving transaction in a Form 10-Q filed with the Commission on November 19, 2002 for the third quarter of 2002. Morano signed the Form 10-Q on behalf of Lumenis and separately certified its accuracy in a Form 8-K filed with the Commission on the same day.

70.    Lumenis did not receive definitive written payment terms from Loving until November 27, 2002. The terms called for payment over 36 months. Both of these conditions would have required that the revenue be deferred under Lumenis' internal revenue recognition criteria.

71.    The recognition of revenue in connection with this transaction was not in conformity with GAAP because there was no persuasive evidence of an arrangement, a fixed or determinable price was lacking, and collectability of the funds was not reasonably assured at the time of the recognition of the revenue.  Additionally, revenue recognition was not in conformity with GAAP because the bill and hold sales lacked a fixed delivery schedule and the customer had not made a fixed commitment to purchase the goods.  Morano knew or recklessly disregarded the fact that recognition of the sale in the third quarter was not in conformity with GAAP and reporting it as such would be misleading to investors.

72.    The improper recognition of the $434,000 sales transaction with Loving  in the third quarter of 2002 resulted in the public dissemination in Commission filings and other communications, including a press release on October 29, 2002 and an earnings call on October 30, 2002, of false and misleading financial information by defendants, including:

a.    Overstatement of revenues of approximately $434,000 for the third quarter of 2002, where reported quarterly revenues were $90.2 million.

b.    Understatement of loss of approximately $287,000 for the third quarter of 2002, where the quarter's reported net loss was $928,000,  reported net loss per diluted share was $.02 for 37,264,000 diluted shares, and reported EBITDA was a positive $8 million.

25

**D.**     **Provision of Inferior Goods to Parpas to Recognize**
         **$384,000 in Revenue in the Third Quarter of 2002**

73.     Lumenis recorded in its books and recognized inappropriately $384,000 in

revenue in the quarter ended September 30, 2002 (the third quarter of 2002) in its Form 10-Q

filed with the Commission on November 19, 2002 when Genger authorized the shipment of a

type of laser not requested by the buyer, distributor K.P. Parpas of Greece ("Parpas") .

74.     On September 30, 2002, Parpas placed an order with Lumenis for, among other

things, a number of Lightsheers.  Lumenis did not have the requested lasers in stock.  Despite

this, Genger authorized the delivery of "service loaner" lasers to Parpas.  Service loaner lasers

were used goods which often were utilized as demonstration units.  In a letter dated December 4,

2002, Parpas complained that he had been sent lasers other than what he ordered, describing

those which he received as "old" lasers and "junk" which could not be presented to his client.

Subsequently, after a meeting with Genger, Lumenis agreed to refurbish the lasers it had

provided to Parpas at no cost to Parpas.  Lumenis did not do so until some time after March 13,

2003.

75.  ·     Genger and Lumenis provided Parpas with products he did not request as a way to

recognize revenue at the close of a financial reporting period.

76.     Lumenis recognized $384,000 in revenue in its Form 10-Q filed with the

Commission on November 19, 2002 for the third quarter of 2002.

77.     GAAP requires that revenue should not be recognized until it is realized or

realizable and earned.  Revenues are earned when the seller has substantially accomplished what

it must do to be entitled to the benefits represented by the revenues.  Genger and Lumenis

provided Parpas with products he did not request as a way to recognize revenue at the close of a

financial reporting period. The resulting revenue recognition therefore did not comport with

GAAP. Genger knew or recklessly disregarded the fact that recognition of the sale in the third

quarter was not in conformity with GAAP and reporting it as such would be misleading to

investors.

78.     The improper recognition of the $384,000 sales transaction with Parpas in the

third quarter of 2002 resulted in the public dissemination in Commission filings and other

communications, including a press release on October 29, 2002 and an earnings call on October

30, 2002, of false and misleading financial information, including:

a.      Overstatement of revenues of approximately $384,000 for the third quarter

of 2002, where reported quarterly revenues were $90.2 million.

b.      Understatement of loss of approximately $178,000 for the third quarter of

2002, where the quarter's reported net loss was $928,000,  reported net loss per diluted share was

$.02 for 37,264,000 diluted shares, and reported EBITDA was a positive $8 million.

**D.    $754,000 CIS/Opus Dent Transaction in the First Quarter of 2003**

79.     Lumenis improperly recorded on its books and recognized $754,000 in the quarter

ended March 31, 2003 (the first quarter of 2003) in its Form 10-Q filed with the Commission on

May 15, 2003 in connection with a bill and hold sales transaction that, among other things,

lacked a fixed delivery schedule and reasonable assurances on collectability. Genger was a

primary negotiator for Lumenis, and Morano concluded that revenue recognition was appropriate

despite contrary opinions of at least three internal Lumenis accountants.

80.    In this transaction, an independent sales representative who represented Opus Dent, a Lumenis subsidiary that sold Lumenis dental products, approached the acting president of Opus Dent and expressed an interest in obtaining all Opus 20 dental lasers owned by Opus Dent and Lumenis.  At the time, the sales representative had not previously purchased anything from Lumenis or Opus Dent.  The sales representative told the Opus Dent president that he was involved with a group of ophthalmologists who wished to convert the dental lasers for use in the field of ophthalmology.  The sales representative did not indicate whether he was buying the lasers for resale to the group of ophthalmologists or buying them on the ophthalmologists' behalf.  The Opus Dent president contacted Genger, and Lumenis soon determined that Lumenis/Opus Dent owned approximately 21 new or used Opus 20 lasers in the U.S., Israel, Japan or Europe, though a number of the lasers were not in Lumenis' possession.

81.    Genger agreed to grant the sales representative extended payment terms of nearly two years to purchase almost $1 million in lasers.  At some point, the sales representative and Lumenis agreed to structure the transaction with an entity named CIS that was wholly-owned by the sales representative.  CIS was a one-man company based out of the sales representative's home in California.  When CIS indicated it did not want all of the lasers immediately because it did not have a warehouse to store the lasers and because it wished to train the ophthalmologists before shipping lasers to them, Genger suggested structuring the transaction as a bill and hold sale.  Opus Dent had not previously undertaken any bill and hold sales.

82.    Morano approved the deal prior to the close of the quarter, even though Lumenis had not performed a credit check on either the sales representative or CIS, and thus collectability

of the debt was not assured.  Moreover, Morano was aware that the payment terms greatly exceeded those normally required for revenue recognition at Lumenis.

83.    At no time prior to the close of the first quarter of 2003 did CIS or the sales representative agree that Lumenis or Opus Dent had the ability to force the heretofore unnamed "group" of ophthalmologists to pay in the event CIS or the sales representative failed to do so.

84.    In a memorandum dated March 31, 2003 which copied Genger and Morano, CIS agreed to purchase the lasers with payments spread over a period 21 months.  The memorandum did not include a delivery schedule (fixed or otherwise), did not include a business purpose explaining the need for a bill and hold sale, and indicated that Lumenis was agreeing to hold onto the units "[a]t the request of [CIS]."  The memorandum did not state that Genger had first suggested that the transaction be on a bill and hold basis.  As of March 31, 2003, Lumenis lacked a signed purchase order with terms and conditions from CIS, normally a requirement under Lumenis' revenue recognition policy.

85.    Shortly after the close of the quarter, CIS and Lumenis negotiated the terms of a bill and hold letter agreement.  Morano provided edits to the bill and hold letter.  Although CIS ultimately signed a bill and hold letter on or about April 9, 2003, the letter, including the version Morano reviewed in April, was backdated to March 31, 2003.  The letter also did not contain a business reason explaining the need for the bill and hold sale and did not contain a fixed delivery schedule for the lasers.

86.    As of March 31, 2003, Lumenis had neither segregated all the goods requested by CIS nor readied them all for shipment as required for revenue recognition in conformity with

29

GAAP. In fact, some of the lasers at issue were not even in Lumenis' possession as of the close of the first quarter of 2003.

87.     Lumenis' controller (who reported to Morano) and Lumenis' assistant controller did not believe revenue should be recognized in connection with the transaction in the first quarter of 2003, and conveyed their conclusions to Morano. Their principal issue dealt with the collectability of the debt and the extended payment terms. Morano ignored their consensus position and determined instead to recognize revenue from the transaction.

88.     On April 9, 2003, a temporary Opus Dent accountant/bookkeeper informed Lumenis finance personnel via email of his conclusion that no revenue should be recognized in connection with the transaction. He cited a number of reasons for his conclusion, including the lack of a signed purchase order, the lack of a fixed delivery schedule, and the fact that the goods did not appear to be segregated or ready for shipment as required for revenue recognition in conformity with GAAP. Morano reviewed the email that same day. In an April 11 email sent to Morano and others on Lumenis' finance staff, the Opus Dent accountant reiterated his belief that no revenue should be recognized.

89.     On April 10, 2003, Lumenis received a Dun & Bradstreet credit report indicating that CIS had only one employee and a past high credit of only $1,600. Morano thereafter told the Opus Dent president that Lumenis needed a guaranty for CIS's obligation. Prior to this time, the Opus Dent president had not had any discussions with CIS or anyone else about a third party potentially guaranteeing CIS's obligation, nor had Lumenis or anyone else obtained such a guaranty, either verbally or otherwise. Shortly thereafter, the Opus Dent president approached

CIS and obtained a third party guaranty in the form of an April 17 letter from a Colorado

ophthalmologist.

90.    Shortly thereafter, Lumenis' outside auditor requested that Lumenis provide him

with a purchase order specifying the terms and conditions entered by CIS.  Lumenis' revenue

recognition policy required that a signed purchase order with all of the terms of the transaction be

received by the end of the quarter in which a sale was to be recognized.  As of that mid-April

2003 date, neither Lumenis nor Opus Dent had received from CIS a signed purchase order with

terms and conditions.  CIS sought to use the fact that it had not yet provided Lumenis and Opus

Dent with these documents as a means to extract concessions from Lumenis and Opus Dent.  On

April 25, 2003, CIS provided the Opus Dent president with a signed purchase order with terms

and conditions.  On the same day, the Opus Dent president faxed the documents to Morano and

another in Lumenis' corporate offices in New York City.  Despite the April 25 handover date and

the mid-Aril 2003 efforts to use Lumenis' lack of a signed purchase order and terms and

conditions as leverage, the purchase order and terms and conditions were dated March 30, 2003.

Morano knew or recklessly disregarded the fact that the purchase order was backdated and had

not been received by Lumenis prior to the quarter's end.

91.    Lumenis' auditor initially concluded that Lumenis should not currently recognize

any revenue in connection with this transaction in part because collectability could not be defined

as probable and certain bill and hold criteria did not appear to be satisfied.  Morano knew of that

conclusion.  Thereafter, Lumenis, at Morano's urging, bullied its auditor into accepting the

company's false and improper conclusion and recognized $754,000 in revenue and associated

profits in connection with this transaction in its Form 10-Q for the first quarter of 2003 filed with

the Commission on May 15, 2003.  Morano signed the Form 10-Q on behalf of Lumenis and separately certified its accuracy as part of the Form 10-Q filing.

92.     In connection with the review of the CIS transactions, Morano made false or misleading statements to Lumenis' auditor, or omitted to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading. Morano falsely informed the auditor that the credit exposure in this case was "similar to exposure we take in other sales to physicians."  Morano provided inaccurate and seemingly fabricated business rationales for why CIS desired to receive the lasers on a bill and hold basis.  Morano failed to inform the auditor that certain of the relevant documents used to support revenue recognition in connection with this transaction were backdated, including the bill and hold letter. Morano failed to inform the auditor that the purchase order with terms and conditions dated March 30, 2003 was not received by Lumenis until late April 2003.  Morano failed to inform the auditor that CIS had not agreed to provide a third-party guaranty prior to the close of the first quarter of 2003 financial reporting period.

93.     After making one payment to Lumenis, CIS refused to pay, citing in part Lumenis' refusal to make what it claimed were agreed-to modifications to the lasers.  Instead of reversing the sale from the first quarter of 2003, Lumenis reversed the sale in the second quarter of 2003.

94.     Recognition of this revenue in the first quarter of 2003 was not in conformity with GAAP because there was no fixed delivery schedule for the delivery of the goods at the time of the revenue recognition, Genger, and not CIS, initially requested that the sale be on a bill and hold basis, collectability of the funds was not reasonably assured, and the transaction relied upon

backdated documents to present the appearance of completion in the first quarter of 2003.

Morano knew or recklessly disregarded the fact that recognition of the sale in the first quarter

was not in conformity with GAAP and reporting it as such would be misleading to investors.

95.     On April 29, 2003, Lumenis filed a Form 8-K with the Commission that included

a press release announcing the first quarter 2003 financial results.  The release announced

quarterly revenue of $80.2 million which allowed the company to meet its previously announced

estimate of $80 to $85 million in the quarter.  Inclusion of $754,000 in revenue in connection

with this CIS transaction permitted Lumenis to announce quarterly revenue in line with its

previously issued public estimate.  Meeting this estimate was important because, once again, the

company had missed meeting its prior revenue estimates in the third and fourth quarters of 2002.

96.     In addition to the dissemination of false revenue figures, the improper recognition

of the $754,000 sales transaction with CIS in the first quarter of 2003 resulted in the public

dissemination in Commission filings and other communications, including a press release and

earnings call on April 29, 2003, of other false and misleading financial information by

defendants, including:

    a.     Understatement of loss of approximately $309,000 for the first quarter of

2003, where the quarter's reported net loss was $6.918 million, reported net loss per diluted share

was $.19 for 37,277,000 diluted shares, and reported EBITDA was a positive $5 million.

**E.     The $632,000 Dr. Wang Transaction In The First Quarter of 2003**

97.     Lumenis inappropriately recorded in its books and recognized $632,000 in

revenue in the quarter ended March 31, 2003 (the first quarter of 2003) in its Form 10-Q filed

with the Commission on May 15, 2003 in connection with a transaction involving a purchaser

named Dr. Wang Yong An, of China. Morano and Genger approved the transaction despite knowing that Lumenis lacked both financing arrangements and shipping instructions as of the close of the quarter.

98.    While in the U.S. in mid-March 2003, Dr. Wang signed a purchase order for $838,000 in Lumenis products. As of the close of the first quarter, the purchase order was the only documentation Lumenis had for the deal with Dr. Wang. The payment terms in the purchase order specified payment was "due upon [product] installation." Lumenis did not agree to an installation date with Dr. Wang before quarter end.

99.    As of the close of quarter, the deal with Dr. Wang was not finalized. Lumenis lacked both financing arrangements and shipping instructions, and Lumenis had not been successful in contacting Dr. Wang to resolve the issues.

100.    Lumenis staff brought the transaction to the attention of Morano and Genger to determine if the products should ship notwithstanding the lack of financing arrangements and delivery instructions, both normally prerequisites to shipment and revenue recognition. Morano and Genger approved the transaction and authorized shipment of the products despite the missing information and documentation. The goods were ordered held at an airport in Israel pending Lumenis' receipt of the shipping information.

101.    Lumenis never delivered the order to Dr. Wang, and on June 19, 2003, the order was canceled.

102.    Lumenis and Morano falsely represented to its outside auditor that the Dr. Wang transaction was a bill and hold transaction that was being appropriately recognized as revenue. The transaction failed to satisfy the relevant accounting criteria for revenue recognition at least in

part because it lacked a fixed delivery schedule, the buyer lacked a substantial business purpose for ordering the goods on a bill and hold basis, the risk of ownership had not passed to the buyer, and the buyer had not made a fixed commitment to purchase the goods.

103.    Despite the lack of terms and shipping instructions, Lumenis recognized revenue of $632,000 in connection with the transaction in the first quarter of 2003 in its Form 10-Q filed with the Commission on May 15, 2003. Morano signed the Form 10-Q on behalf of Lumenis and separately certified its accuracy as part of the Form 10-Q filing. Inclusion of revenue in connection with this transaction permitted Lumenis to announce quarterly revenue for the first quarter of 2003 in line with its previously issued public estimate.

104.    GAAP requires that revenue be recognized when it is realized or realizable and earned. This standard is satisfied in part when delivery of the product has occurred. Here, delivery of the product to Dr. Wang never occurred, and further, collectability was not reasonably assured. Also, risk of ownership had not passed to Dr. Wang. As such, Lumenis' recognition of revenue in the first quarter of 2003 in connection with this transaction departed from GAAP. Morano and Genger knew or was reckless in not knowing this transaction should not have been recognized as revenue in the first quarter of 2003.

105.    The improper recognition of the $632,000 sales transaction with Dr. Wang in the first quarter of 2003 resulted in the public dissemination in Commission filings and other communications, including a press release and an earnings call on April 29, 2003, of false and misleading financial information by defendants, including:

    a.    Overstatement of revenues of approximately $632,000 for the first quarter of 2003, where reported quarterly revenues were $80.2 million.

b.      Understatement of loss of approximately $461,000 for the first quarter of 2003, where the quarter's reported net loss was $6.918 million, reported net loss per diluted share was $.19 for 37,277,000 diluted shares, and reported EBITDA was a positive $5 million.

## III.    Impact of the Improperly Accounted For Transactions

106.    Below is a chart showing the cumulative impact by quarter of all of the above discussed improper transactions in a given quarter on certain of Lumenis' reported financial metrics (the "revised" numbers take into account the improper transactions).

| Financial Metric | 2001 Q4 | 2002 Q1 | 2002 Q2 | 2002 Q3 | 2002 Q4 | 2003 Q1 |
|---|---|---|---|---|---|---|
| Reported Net Loss Before Taxes | -$560 | -$542 | -$898 | -$312 | -$36,974 | -$5,628 |
| Revised Net Loss Before Taxes | -$1,176 | -$759 | -$3,806 | -$1,492 | -$37,234 | -$6,399 |
| % Loss Understatement | 52.40% | 28.62% | 76.41% | 79.09% | 0.70% | 12.04% |
| | | | | | | |
| Reported Net Loss | -$3,900 | -$643 | -$1,300 | -$928 | -$39,716 | -$6,918 |
| Revised Net Loss | -$4,516 | -$840 | -$4,208 | -$2,108 | -$39,976 | -$7,689 |
| % Loss Understatement | 13.65% | 25.26% | 69.11% | 55.98% | 0.65% | 10.02% |
| | | | | | | |
| Reported EBITDA | | $7,500 | $8,400 | $8,000 | -$9,500 | $2,000 |
| Revised EBITDA | | $7,283 | $5,492 | $6,820 | -$9,760 | $1,229 |
| % EBITDA Overstatement (Understatement) | | 2.98% | 52.95% | 17.30% | 2.67% | 62.69% |
| | | | | | | |
| Reported EPS | -$0.11 | -$0.02 | -$0.04 | -$0.02 | -$1.07 | -$0.19 |
| Revised EPS | -$0.12 | -$0.02 | -$0.11 | -$0.06 | -$1.07 | -$0.21 |
| % Loss Understatement | 8.33% | | 63.64% | 66.67% | | 9.52% |
| | | | | | | |
| (in thousands, except per share data, loss/profit numbers are for indicated periods) | | | | | | |

107.    In addition to the false filings with the Commission, Lumenis announced the above described misleading financial metrics in quarterly press releases issued shortly after the end of each quarter.  For those press releases issued after March 1, 2002, Morano was involved

with the process of reviewing the press releases for accuracy prior to their dissemination and knew or recklessly disregarded the fact that the press releases contained materially misleading financial metrics. Morano was listed as the contact person for each of the misleading press releases issued after March 1, 2002. The press releases with misleading quarterly financial information were issued on the following dates:

| Quarter Ended | Press Release Date(s) |
|---|---|
| 12-31-01 | 1-29-02, 2-28-02 |
| 3-31-02 | 5-13-02 |
| 6-30-02 | 8-5-02 |
| 9-30-02 | 10-22-02, 10-29-02 |
| 12-31-02 | 2-19-03 |
| 3-31-03 | 4-29-03 |

108.   During 2002 and 2003, Lumenis also held quarterly earnings calls, open to the public and market analysts, to discus the company's financial results. Morano and Genger participated in the conference phone calls and knew or recklessly disregarded the fact that they and others disclosed materially false and misleading financial results. Transcripts of the calls were made available to the public and a recording of the actual call was published on Lumenis' website. In the earnings calls after March 1, 2002, Morano knowingly or recklessly stated materially misleading financial information in the earnings calls, including false revenues, net loss, earnings per share, and EBITDA numbers as described above. The earnings calls occurred on the following dates:

| Quarter Ended | Earnings Call Date(s) |
|---|---|
| 12-31-01 | 2-28-02 |
| 3-31-02 | 5-13-02 |
| 6-30-02 | 8-6-02 |
| 9-30-02 | 10-22-02, 10-29-02 |
| 12-31-02 | 2-20-03 |
| 3-31-03 | 4-30-03 |

109.    In addition to the above described initial false publication of misleading financial metrics in commission filings, press releases and earnings calls, the false metrics were repeated by the defendants on numerous occasions.  For example, the Form 10-K filed for 2002 repeated the false quarterly results for the fourth quarter of 2001 and the first three quarters of 2002. Additionally, when the company announced quarterly results for the fourth quarter of 2002, and the first two quarters of 2003, the misleading results from the fourth quarter of 2001, and the first two quarters of 2002, respectfully, were republished.  Morano and Genger knew or recklessly disregarded the fact that the false financial metrics would be republished at various times by Lumenis.

## IV.    Morano's Certifications and Signatures

110.    As a duly authorized Lumenis officer and Lumenis CFO, Morano signed Lumenis' Forms 10-Q or Forms 10-Q/A filed with the Commission on May 15, 2002 (first quarter of 2002), August 15, 2002 (second quarter of 2002), November 19, 2002 (two filings, one for the second quarter of 2002 and the other for the third quarter of 2002) and May 15, 2003 (first

quarter of 2003) and its Form 10-K filed with the Commission on March 28, 2003 (fiscal year 2002). Morano also signed Forms 8-K filed with the Commission containing certifications of the Forms 10-Q or 10-K as required by Section 906 of the Sarbanes-Oxley Act of 2002 [18 U.S.C. § 1350] on August 15, 2002 (second quarter 2002), November 19, 2002 (third quarter of 2002), March 28, 2003 (fiscal year 2002), and May 15, 2003 (first quarter of 2003). In addition, four of the Lumenis filings – the Form 10-Q/A filed on November 19, 2002 (second quarter of 2002), the Form 10-Q filed on November 19, 2002 (third quarter of 2002), the Form 10-K filed on March 28, 2003 (fiscal year 2002), and the Form 10-Q filed on May 15, 2003 (first quarter of 2003) – contained Morano certifications as required by Exchange Act Rule 13a-14 [17 C.F.R. § 240.13a-14]. Morano also signed a Form 8-K filed with the Commission on April 30, 2003 that contained a press release announcing Lumenis' first quarter 2003 financial results.

**V.      Securities Offered in 2002 and 2003**

111.    Lumenis offered securities in 2002 and 2003 at the same time its financial statements contained materially false statements.

112.    In July 2001, Lumenis filed with the Commission a Form S-8 registering securities to be offered pursuant to an employee stock option plan. The Form S-8 incorporated by reference all Lumenis reporting filings to be made in the future.

113.    In March 2003, Lumenis filed with the Commission a Form SC TO-I tender offer statement that offered those holding Lumenis options with an exercise price of greater than $6.00 the right to exchange those options for new options with an exercise price equal to the market value at the time of the exchange. Morano signed the Form SC TO-I as executive vice president and CFO of Lumenis.

114.   In July 2003, Lumenis filed with the Commission a Form S-8 registering

securities to be offered pursuant to an employee stock option plan.  Morano signed the Form S-8

as executive vice president and CFO of Lumenis.  The Form S-8 incorporated by reference the

Form 10-K filed by Lumenis on March 28, 2003 for fiscal year 2002 and the Form 10-Q filed by

Lumenis on May 15, 2003 for the first quarter of 2003.

### FIRST CLAIM
#### (All Defendants )
**Fraud In Connection With The Purchase Or Sale Of Securities in
Violation of Exchange Act § 10(b) and Rule 10b-5**

115.   Plaintiff Commission repeats and realleges paragraphs 1 through 114 above.

116.   As set forth above, Morano overruled finance staff objections and permitted

Lumenis to recognize revenue in a number of transactions despite significant red flag warnings

that should have prevented such recognition, made materially false and misleading statements in

Forms10-Q or 10-K filed with the Commission in 2002 and 2003 and other public disclosures,

and certified the accuracy of financial statements that contained materially false and misleading

statements.  Morano knew or was reckless in not knowing that these filings and other public

statements were materially false and misleading.

117.   As set forth above, Genger participated in a fraudulent scheme to artificially

inflate Lumenis' revenue and falsify Lumenis financial disclosures.  Genger's conduct directly

resulted in the publication of materially false and misleading Lumenis financial statements.

118.   By reason of the foregoing, Lumenis, Genger and Morano, singly or in concert

with others, directly or indirectly, in connection with the purchase or sale of securities, by the use

of any means and instrumentalities of interstate commerce, or of the mails, or any facility of any

40

national securities exchange: (a) employed devices, schemes, or artifices to defraud; (b) made

untrue statements of material fact or omitted to state material facts necessary in order to make the

statements made, in the light of the circumstances under which they were made, not misleading;

or (c) engaged in acts, practices or courses of business which operated or would operate as a

fraud or deceit upon any persons, including purchasers or sellers of Lumenis securities, in

violation of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. §

240.10b-5] thereunder.

119.    The conduct of Lumenis, Genger and Morano involved fraud, deceit, or deliberate

or reckless disregard of regulatory requirements, and resulted in substantial loss, or significant

risk of substantial loss, to other persons, within the meaning of Section 21(d)(3) of the Exchange

Act [15 U.S.C. § 78u(d)(3)].

### SECOND CLAIM
**(All Defendants)**
**Fraud in the Offer or Sale of Securities in Violation of Securities Act § 17(a)**

120.    Plaintiff Commission repeats and realleges paragraphs 1 through 114 above.

121.    As described above, Lumenis, Genger and Morano engaged in fraudulent

activities and a fraudulent scheme resulting in numerous materially false and misleading

statements in 2002 and 2003.

122.    During 2002 and 2003, Lumenis offered registered securities at the same time its

financial statements filed with the Commission contained materially false or misleading

statements.

123.    By reason of the foregoing, Lumenis, Genger and Morano, directly or indirectly,

acting intentionally, knowingly or recklessly, by use of the means or instruments of

transportation or communication in interstate commerce or by the use of the mails, in the offer

or sale of securities: (a) employed devices, schemes or artifices to defraud; (b) obtained money or

property by means of untrue statements of material fact or omissions to state material facts

necessary in order to make the statements made, in the light of the circumstances under which

they were made, not misleading; or (c) engaged in transactions, practices or courses of business

which operated or would operate as a fraud or deceit upon certain purchasers, including

purchasers of Lumenis securities.

### THIRD CLAIM
**(Genger and Morano)**
**Circumvention of Internal Controls and Falsification of Accounting Records
in Violation of Exchange Act § 13(b)(5) and Rule 13b2-1**

124.    Plaintiff Commission repeats and realleges paragraphs 1 through 114 above.

125.    By reason of the foregoing, Genger and Morano knowingly circumvented

Lumenis internal accounting controls; or, directly or indirectly, falsified, or caused to be falsified,

Lumenis' books, records and accounts in violation of Section 13(b)(5) of the Exchange Act [15

U.S.C. § 78m(b)(5)] and Exchange Act Rule 13b2-1 [17 C.F.R. § 240.13b2-1].

### FOURTH CLAIM
**(Lumenis)**
**Reporting of False and Misleading Information in Annual Statements
in Violation of Exchange Act  § 13(a) and Rules 12b-20 and 13a-1**

126.    Plaintiff Commission repeats and realleges paragraphs 1 through 114 above.

127.    Lumenis reported materially false and misleading information in its Forms 10-K

filed with the Commission on April 1, 2002 and March 28, 2003.

128.    By reason of the foregoing, Lumenis violated Section 13(a) of the Exchange Act

[15 U.S.C. § 78m(a)] and Rules 12b-20 and 13a-1 thereunder [17 C.F.R.  §§ 240.12b-20 and

240.13a-1], and therefore is liable pursuant to Section 20(e) of the Exchange Act [15 U.S.C. §

78t(e)].

## FIFTH CLAIM
### (Lumenis)
### Reporting of False and Misleading Information in Quarterly Reports
### in Violation of Exchange Act § 13(a) and Rules 12b-20 and 13a-13

129.    Plaintiff Commission repeats and realleges paragraphs 1 through 114 above.

130.    Lumenis reported materially false and misleading information in its Forms 10-Q

or Forms 10-Q/A filed with the Commission on May 15, 2002 (first quarter of 2002), August 15,

2002 (second quarter of 2002), November 19, 2002 (two filings: one for the second quarter of

2002 and the other for the third quarter of 2002) and May 15, 2003 (first quarter of 2003).

131.    By reason of the foregoing, Lumenis violated Section 13(a) of the Exchange Act

[15 U.S.C. § 78m(a)] and Rules 12b-20 and 13a-13 thereunder [17 C.F.R. §§ 240.12b-20 and

240.13a-13], and therefore is liable pursuant to Section 20(e) of the Exchange Act [15 U.S.C. §

78t(e)].

## SIXTH CLAIM
### (Lumenis)
### Reporting of False and Misleading Information in Forms 8-K
### in Violation of Exchange Act § 13(a) and Rules 12b-20 and 13a-11

132.    Plaintiff Commission repeats and realleges paragraphs 1 through 114 above.

133.    Lumenis reported materially false and misleading information in its Forms 8-K

filed with the Commission on August 15, 2002, November 19, 2002, March 28, 2003, April 30,

2003, and May 15, 2003.

134.    By reason of the foregoing, Lumenis violated Section 13(a) of the Exchange Act

[15 U.S.C. § 78m(a)] and Rules 12b-20 and 13a-11 thereunder [17 C.F.R. §§ 240.12b-20 and

240.13a-11], and therefore is liable pursuant to Section 20(e) of the Exchange Act [15 U.S.C. §

78t(e)].

### SEVENTH CLAIM
### (Lumenis)
### Maintenance of False and Misleading Books and Records
### in Violation of Exchange Act § 13(b)(2)(A)

135.   Plaintiff Commission repeats and realleges paragraphs 1 through 114 above.

136.   Lumenis maintained false and misleading books and records, which, among other

things, materially understated the company's net losses and materially overstated the company's

revenue.

137.   By reason of the foregoing, Lumenis violated Section 13(b)(2)(A) of the

Exchange Act [15 U.S.C. § 78m(b)(2)(A)], and therefore is liable pursuant to Section 20(e) of

the Exchange Act [15 U.S.C. § 78t(e)].

### EIGHTH CLAIM
### (Lumenis)
### Failure to Maintain Internal Controls
### in Violation of Exchange Act § 13(b)(2)(B)

138.   Plaintiff Commission repeats and realleges paragraphs 1 through 114 above.

139.   Lumenis failed to devise and maintain a system of internal accounting controls

sufficient to provide reasonable assurances that the company's transactions were recorded as

necessary to permit preparation of financial statements in conformity with GAAP.

140.   By reason of the foregoing, Lumenis violated Section 13(b)(2)(B) of the Exchange

Act [15 U.S.C. § 78m(b)(2)(B)], and therefore is liable pursuant to Section 20(e) of the Exchange

Act [15 U.S.C. § 78t(e)].

## NINTH CLAIM
### (Genger and Morano)
### Aiding and Abetting Lumenis' Reporting
### of False and Misleading Information in Annual Statements in Violation of
### Exchange Act § 13(a) and Rules 12b-20 and 13a-1

141.    Plaintiff Commission repeats and realleges paragraphs 1 through 114 above.

142.    Lumenis reported materially false and misleading information in its Forms 10-K filed with the Commission on April 1, 2002 and March 28, 2003.

143.    Genger knew, or was reckless in not knowing, that Lumenis' conduct was improper, and knowingly and substantially assisted Lumenis to report materially false and misleading information in its Forms 10-K filed with the Commission on April 1, 2002 and March 28, 2003.

144.    Morano knew, or was reckless in not knowing, that Lumenis' conduct was improper, and knowingly and substantially assisted Lumenis to report materially false and misleading information in its Forms 10-K filed with the Commission on March 28, 2003.

145.    By reason of the foregoing, Genger and Morano aided and abetted Lumenis' violation of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20 and 13a-1 thereunder [17 C.F.R. §§ 240.12b-20 and 240.13a-1], and therefore are liable pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)].

## TENTH CLAIM
### (Genger and Morano)
### Aiding and Abetting Lumenis' Reporting
### of False and Misleading Information in Quarterly Reports in Violation of
### Exchange Act § 13(a) and Rules 12b-20 and 13a-13

146.    Plaintiff Commission repeats and realleges paragraphs 1 through 114 above.

147.    Lumenis reported materially false and misleading information in its Forms 10-Q

or Forms 10-Q/A filed with the Commission on May 15, 2002 (first quarter of 2002), August 15, 2002 (second quarter of 2002), November 19, 2002 (two filings, one for the second quarter of 2002 and the other for the third quarter of 2002) and May 15, 2003 (first quarter of 2003).

148.    Both Genger and Morano knew, or were reckless in not knowing, that Lumenis' conduct was improper, and each knowingly and substantially assisted Lumenis to report materially false and misleading information in its Forms 10-Q filed with the Commission on May 15, 2002 (first quarter of 2002), August 15, 2002 (second quarter of 2002), November 19, 2002 (two filings, one for the second quarter of 2002 and the other for the third quarter of 2002) and May 15, 2003 (first quarter of 2003).

149.    By reason of the foregoing, both Genger and Morano aided and abetted Lumenis' violation of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20 and 13a-13 thereunder [17 C.F.R. §§ 240.12b-20 and 240.13a-13], and therefore are liable pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)].

**ELEVENTH CLAIM**
**(Genger and Morano)**
**Aiding and Abetting Lumenis' Reporting**
**of False and Misleading Information in Forms 8-K**
**in Violation of Exchange Act § 13(a) and Rules 12b-20 and 13a-11**

150.    Plaintiff Commission repeats and realleges paragraphs 1 through 114 above.

151.    Lumenis reported materially false and misleading information in its Forms 8-K filed with the Commission on August 15, 2002, November 19, 2002, March 28, 2003, April 30, 2003, and May 15, 2003.

152.    Both Genger and Morano knew, or were reckless in not knowing, that Lumenis' conduct was improper, and both knowingly and substantially assisted Lumenis to report

materially false and misleading information in Forms 8-K filed with the Commission on August

15, 2002, November 19, 2002, March 28, 2003, April 30, 2003, and May 15, 2003.

153.    By reason of the foregoing, both Genger and Morano aided and abetted Lumenis'

violation of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20 and 13a-

11 thereunder [17 C.F.R. §§ 240.12b-20 and 240.13a-11], and therefore are liable pursuant to

Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)].

## TWELFTH CLAIM
### (Genger and Morano)
**Aiding and Abetting Lumenis' Maintenance of False and Misleading Books and Records in
Violation of Exchange Act § 13(b)(2)(A)**

154.    Plaintiff Commission repeats and realleges paragraphs 1 through 114 above.

155.    Lumenis maintained false and misleading books and records, which, among other

things, materially understated the company's net losses and materially overstated the company's

revenue.

156.    Both Genger and Morano knew, or was reckless in not knowing, that Lumenis'

conduct was improper, and knowingly and substantially assisted Lumenis to keep and maintain

false and misleading books and records.

157.    By reason of the foregoing, both Genger and Morano aided and abetted Lumenis'

violations of Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)], and therefore

are liable pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)].

## THIRTEENTH CLAIM
### (Genger and Morano)
**Aiding and Abetting Lumenis' Failure to Maintain Internal Controls
in Violation of Exchange Act § 13(b)(2)(B)**

158.    Plaintiff Commission repeats and realleges paragraphs 1 through 114 above.

159.   Lumenis failed to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that the company's transactions were recorded as necessary to permit preparation of financial statements in conformity with GAAP.

160.   Both Genger and Morano knew, or was reckless in not knowing, that Lumenis' conduct was improper, and each knowingly and substantially assisted Lumenis' failure to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that the company's transactions were recorded as necessary to permit preparation of financial statements in conformity with GAAP.

161.   By reason of the foregoing, both Genger and Morano aided and abetted Lumenis' violations of Section 13(b)(2)(B) of the Exchange Act [15 U.S.C. § 78m(b)(2)(B)], and therefore is liable pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)].

**FOURTEENTH CLAIM**
**(Genger and Morano)**
**Violations of Exchange Act Rule 13b2-2**

162.   Plaintiff Commission repeats and realleges paragraphs 1 through 114 above.

163.   Both Genger and Morano were officers of Lumenis who, directly or indirectly, made or caused to be made materially false or misleading statements to an accountant in connection with, or omitted to state, or caused another person to omit to state, any material fact necessary in order to make statements made, in light of the circumstances under which such statements were made, not misleading, to an accountant in connection with an audit, review or examination of the financial statements of Lumenis required to be made pursuant to the Exchange Act or the preparation or filing of any document or report required to be filed with the Commission pursuant to the Exchange Act or otherwise.

164.    By reason of the foregoing, Genger and Morano violated Exchange Act Rule 13b2-2 [17 C.F.R. §§ 240.13b2-2], and therefore are liable pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)].

**FIFTEENTH CLAIM**
**(Morano)**
**Violations of Exchange Act Rule 13a-14**

165.    Plaintiff Commission repeats and realleges paragraphs 1 through 114 above.

166.    Morano certified the accuracy of Lumenis' Forms 10-Q or 10-Q/A filed with the Commission on November 19, 2002 (two filings, one for the second of 2002 and one for the third quarters of 2002), and May 15, 2003 (first quarter of 2003) and the Form 10-K filed with the Commission on March 28, 2003 (fiscal year 2002).

167.    The above-mentioned forms filed with the Commission contained materially false and misleading statements.

168.    Morano knew, or was reckless in not knowing, that the forms filed with the Commission that he was certifying contained materially false or misleading statements.

169.    By reason of the foregoing, Morano violated Exchange Act Rule 13a-14 [17 C.F.R. §§ 240.13a-14], and therefore is liable pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)].

**SIXTEENTH CLAIM**
**(Morano)**
**(Aiding and Abetting Lumenis' Violations of Section 10(b)**
**of the Exchange Act and Rule 10b-5)**

170.    Plaintiff Commission repeats and realleges paragraphs 1 through 114 above.

171.    As set forth above, defendant Lumenis violated Section 10(b) of the Exchange Act

49

[15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder.

172.   As set forth above, defendant Morano knew, or was reckless in not knowing, that Lumenis' conduct was improper and he knowingly and substantially assisted Lumenis' violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder.

173.   By reason of the foregoing, Morano aided and abetted Lumenis' violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder, and therefore is liable pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)].

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Commission respectfully requests that this Court issue a Final Judgment:

### I.

Permanently enjoining Lumenis from violating, directly or indirectly:

a.   Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)];

b.   Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder;

c.   Section 13(a) of the Exchange Act [15 U.S.C. §§ 78m(a)] and Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11, and 240.13a-13; and

d.   Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(b)(2)(A) and 78m(b)(2)(B)].

## II.

Permanently enjoining Genger from violating, directly or indirectly:

a.    Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)];

b.    Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder;

c.    Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)] and Rules 13b2-1 and 13b2-2 thereunder [17 C.F.R. §§ 240.13b2-1 and 240.13b2-2];

d.    Section 13(a) of the Exchange Act [15 U.S.C. §§ 78m(a)] and Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11, and 240.13a-13]; and

e.    Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(b)(2)(A) and 78m(b)(2)(B)].

## III.

Permanently enjoining Morano from violating, directly or indirectly:

a.    Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)];

b.    Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder;

c.    Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)] and Rules 13b2-1 and 13b2-2 thereunder [17 C.F.R. §§ 240.13b2-1 and 240.13b2-2];

d.    Section 13(a) of the Exchange Act [15 U.S.C. §§ 78m(a)] and Rules 12b-20, 13a-1, 13a-11, 13a-13 and 13a-14 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11, 240.13a-13, and 240.13a-14]; and

e.    Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(b)(2)(A) and 78m(b)(2)(B)].

## IV.

Permanently prohibiting Genger and Morano from acting as an officer or director of any

issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15

U.S.C. § 78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)].

## V.

Requiring Genger and Morano to pay civil money penalties pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)] in an amount to be determined by the Court.

## VI.

Ordering such other and further relief as this case may require under equity and the Court deems appropriate.

## JURY DEMAND

The Commission hereby demands a trial by jury on all claims so triable.

Respectfully submitted,

David P. Bergers
District Administrator

R. Daniel O'Connor (RO5217)
District Trial Counsel
oconnord@sec.gov

Timothy B. Henseler (TH2748)
Senior Enforcement Counsel
henselert@sec.gov

Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
33 Arch Street, 23rd Floor
Boston, MA  02110
(617) 573-8979
(617) 424-5940  fax

Dated: April 26, 2006